UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

UNITED STATES OF AMERICA,

                                    Plaintiff,

            v.

MARCUS BROWN,

                                    Defendant.
———————————————————————

REPORT & RECOMMENDATION

18-CR-6119CJS


## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated August

7, 2018, all pretrial matters in the above-captioned case have been referred to this Court pursuant

to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 23).

Defendant Marcus Brown ("Brown") has been charged in a nine-count

indictment.  (Docket # 22).  The first count charges Brown with conspiracy to commit sex

trafficking, in violation of 18 U.S.C. § 1594(c).  The second and third counts charge Brown with

sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a), 1591(b)(1), 1591(b)(2), 1591(c),

and 2.  (*Id.*).  Counts Four through Nine charge Brown with actual and attempted production,

distribution, and possession of child pornography, in violation of 18 U.S.C. §§ 2251(a), 2251(e),

2252A(a)(2)(A), 2252A(a)(5)(B) and 2252A(b)(1) & (2), and 2.  (Docket # 22).  Currently

pending before this Court for report and recommendation are Brown's motions to dismiss the

indictment and to suppress statements and evidence.  (Docket ## 65, 118, 126, 127, 138).[1]  For

———————————————————

[1]  Brown originally filed omnibus motions on May 16, 2019, and supplemented that submission on January
2, 2020, after the district court rejected the parties' plea agreement.  (Docket ## 65, 112, 118).  During oral
argument on the supplemental motions on February 26, 2020, counsel for Brown confirmed that the supplemental

the reasons discussed below, I recommend that the district court deny Brown's motions to dismiss the indictment and to suppress statements and evidence.

## FACTUAL BACKGROUND

Brown seeks to dismiss the indictment on the grounds that (1) the government's preindictment delay violated due process and (2) the investigation leading to the indictment was tainted by an unlawful search conducted by Rochester Police Investigator Nolan Wengert ("Wengert") on October 14, 2015. (Docket ## 118 at 29-30; 126; 138). He also seeks to suppress tangible evidence seized and statements he made on April 18, 2018, on the grounds that they constitute fruit of the unlawful search conducted on October 14, 2015. (Docket ## 118 at 5-7; 126; 138). Finally, he also seeks to suppress the April 18, 2018 statements contending that they were not voluntarily made.[2] (Docket ## 126 at ¶ 4; 127 at ¶¶ 4-11).

The government opposes Brown's dismissal and suppression motions. (Docket ## 120 at 2-6, 16; 131). With respect to the events that occurred on October 14, 2015, the government maintains that Brown voluntarily consented to permit Wengert to search his property and that the search was thus lawful and did not taint any subsequent investigative efforts. (Id.).

---

submission included all the relief that Brown seeks. (Docket # 151). That submission also sought, *inter alia*, a bill of particulars, *Brady* material, discovery and inspection, evidentiary rulings pursuant to Rules 404(b), 608 and 609, identification of informants, *Jencks* materials, preservation of rough notes, disclosure of personnel records, disclosure of grand jury minutes, and leave to file additional motions. (Docket # 118). Each of these requests was either resolved by the parties or decided in open court by the undersigned on January 22, 2020. (Docket ## 122, 123).

Brown also seeks to suppress identification testimony. (Docket # 118 at 7). The district judge has indicated that he will entertain and resolve that motion at or near the time of trial. (Docket # 152).

[2] Brown's motion to suppress the tangible evidence seized on April 18, 2018, is limited to the contention that it constitutes fruit of the unlawful search conducted on October 14, 2015. To the extent Brown requests this Court to review the search warrant authorizing the April 18, 2018 search to identify any "defects" (Docket # 118 at 6), as the Court indicated during oral argument on January 22, 2020, it declines to do so in the absence of a specific, articulated challenge to the warrant. (Docket # 122).

Nonetheless, because Wengert is now deceased, the government represents that it will not seek to introduce into evidence any statements Brown made that day or any evidence it seized during the October 2015 search. (*Id.*). With respect to the April 2018 statements and seizure of evidence, the government asserts that the evidence was seized pursuant to a valid warrant and that the statements were voluntarily made. (Docket # 131 at 2-3).

## I.    <u>October 14, 2015 Encounter</u>[3]

On October 1, 2015, Wengert met with a sixteen-year-old girl (hereinafter "MV1") who reported that she had been sexually assaulted and had participated in prostitution activity involving several individuals, including Brown and his former co-defendant, Ray Davis ("Davis").[4] (Wengert Aff. at ¶ 5). MV1 reported to Wengert that Davis and Brown took nude photographs of her using a white Samsung phone owned by Brown and that the photographs were subsequently used in online prostitution advertisements. (*Id.*). She also reported that Brown's phone was used to coordinate prostitution activity through text messages. (*Id.*).

On October 14, 2015, Wengert conducted a traffic stop of a vehicle driven by Brown. (Docket # 118-1 at 18-19). Wengert arrested Brown, and he was transported to the Public Safety Building. (*Id.*). According to Wengert, after Brown was advised of his *Miranda*

---

[3] The facts relating to this encounter are drawn from several documents submitted in connection with the motions: namely, Brown's affidavit (Docket # 127), an affidavit sworn by Wengert in support of a search warrant for a phone belonging to Brown (hereinafter "Wengert Aff."), documents completed during the interview of Brown on October 14, 2015, including Rochester Police Department ("RPD") Notification and Waiver card (hereinafter "*Miranda* Waiver"), RPD Consent to Search Form RPD 1353 (hereinafter "Consent to Search"), and a statement signed by Brown during his interview (hereinafter "Brown's Statement"), and Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") reports authored by Special Agent Glenn Erny ("Erny") (Docket # 118-1 at 16-19) (hereinafter "HSI Reports"). *See United States v. Yousef*, 327 F.3d 56, 145 (2d Cir.) (Federal Rules of Evidence permit reliance on affidavits in determining admissibility of defendant's statement) (citing Fed. R. Evid. 104(a); 1101(d)(1)), *cert. denied*, 540 U.S. 933 (2003); *United States v. Demosthene*, 326 F. Supp. 2d 531, 534 (S.D.N.Y. 2004) ("[w]hen ruling on the admissibility of evidence, a court is not bound by the [F]ederal [R]ules of [E]vidence and may rely upon hearsay and other reliable evidence").

[4] Davis was convicted on Counts One through Seven after a jury trial. (Docket # 109).

rights,[5] Wengert interviewed him concerning MV1. (*Id.*). During that interview, Brown told

Wengert that he had let MV1 use one of his cellphones. (Docket # 118-1 at 18-19; Brown's

Statement). Brown explained that he had since gotten a new phone, but that the phone MV1 had

used was at his house. (Brown's Statement). Brown also consented to permit Wengert to view

his email and Facebook accounts, as well as to search his residence for the phone used by MV1.

(Docket # 118-1 at 18-19; Brown's Statement).

        At the conclusion of the interview, at approximately 7:40 p.m., Brown signed a

written statement summarizing the substance of the interview.[6] (Brown's Statement). In the

---

[5] In connection with the interview, Wengert completed a *Miranda* waiver card indicating that he provided the *Miranda* warnings to Brown at the Public Safety Building on October 14, 2015 at 5:42 p.m. (*See Miranda* Waiver). The *Miranda* waiver provided as follows:

    1. You have the right to remain silent - you do not have to say anything if you don't want to.
    2. That anything you do say can be used against you in a court of law.
    3. You have the right to talk to a lawyer before answering any questions and have him here with you.
    4. If you can't pay for a lawyer, one will be given to you before any questioning if you wish.
    5. If you do wish to talk with me, you can stop at any time.

(*Id.*). The *Miranda* waiver also contained the following questions:

    1. Do you understand what I have just said to you?
    2. With these rights in mind, do you agree to talk with me now?

(*Id.*). Brown responded affirmatively to both questions. (*Id.*).

[6] At the top of each page of the written statement was the following language in all capital letters:

-   I HAVE THE RIGHT TO REMAIN SILENT;
-   I DO NOT HAVE TO SAY ANYTHING IF I DON'T WANT TO;
-   ANYTHING THAT I DO SAY CAN BE USED AGAINST ME IN A COURT OF LAW;
-   I HAVE THE RIGHT TO TALK TO A LAWYER BEFORE I ANSWER ANY QUESTIONS AND TO HAVE THEM HERE WITH ME DURING ANY QUESTIONING IF I WISH;
-   THAT IF I AGREE TO TALK ABOUT THIS MATTER WITHOUT A LAWYER PRESENT, I CAN STOP TALKING AT ANYTIME.

statement, Brown acknowledged that he had provided permission to Wengert to view his email and Facebook accounts and to search his residence for the phone used by MV1. (Docket # 118-1 at 18-19; Brown's Statement). At 7:45 p.m., Brown executed a consent to search form to permit Wengert to search his residence for the cell phone that MV1 had used, as well as to search the phone itself.[7] (Consent to Search).

Brown was then transported to his residence, and Wengert and Investigator O'Shaughnessy assisted him in searching the residence for the phone used by MV1, but they were unable to locate the phone inside the residence. (Docket ## 118-1 at 19; 127 at ¶ 3). Brown described the phone as having a cracked screen; Wengert indicated that he recalled seeing such a phone in the vehicle Brown had been driving when he was stopped. (Docket # 118-1 at 19). According to the HSI Reports, Brown provided Wengert with his consent to remove the phone from the vehicle. (*Id.*).

The phone was retrieved from Brown's vehicle, and Wengert reviewed its contents for approximately twenty minutes. (Docket ## 118-1 at 19; 127 at ¶ 3). During his review, Wengert observed text messages from MV1, text message conversations involving sex for money, a non-pornographic photograph of MV1, and a photograph of Brown holding a

---

> I HAVE READ THIS STATEMENT OF MY RIGHTS (OR HAVE HAD THIS STATEMENT READ TO ME) I WILLINGLY MAKE THE FOLLOWING STATEMENT:

(Brown's Statement).

[7] The consent to search form contained the following language:

> I am giving permission to these members of the [RPD] to take any item, materials or other property which they may desire. The permission is being given by me to members of the [RPD] voluntarily, and without fear, threats, or promises of any kind.

(Consent to Search). Brown's signature appears directly below this language. (*Id.*). The form contained blank boxes to indicate whether the consent was for the search of a premises, vehicle, personal property, or a person. (*Id.*). The boxes for premises and personal property were checked; the boxes for vehicle and person were not. (*Id.*).

handgun. (Docket # 118-1 at 19). Wengert also observed a phone number for Davis under a nickname in the contact section, as well as the phone number for another individual associated with the investigation. (*Id.*). Wengert then powered the phone off and placed it into evidence.[8] (*Id.*).

## II.    April 18, 2018 Arrest of Brown

At approximately 11:12 a.m. on April 18, 2018, HSI Special Agent Glenn Erny ("Erny") led a team of approximately six law enforcement officers, including several Rochester Police Department ("RPD") officers, to execute an arrest warrant for Brown.[9] (Disc 1 at 11:12:13; Disc 3 at 11:12:13). They knocked on the door to the apartment Brown shared with his mother and girlfriend. (Disc 1 at 11:12:48; Disc 3 at 11:12:50). A voice from inside asked, "Who is it?"; they responded, "Police." (Disc 1 at 11:12:59; Disc 3 at 11:13:02). The door was opened from inside, and the team entered the apartment. (Disc 1 at 11:13:11; Disc 3 at 11:13:13). Brown, who had answered the door unclothed, was directed to place his hands behind his back and was asked whether there was anyone else inside. (Disc 1 at 11:13:17). Brown

---

[8]  A few days later, on October 22, 2015, Wengert encountered Brown on a public street, at which time Brown admitted that his white Samsung phone was used to take naked pictures of MV1, which were used in advertisements. (Wengert Aff.). At that time, Brown produced a white Samsung phone from his pocket and provided it to Wengert, along with the passcode for the phone. (*Id.*). Presumably, the phone that Brown produced from his pocket was the newer phone he had indicated during the October 14, 2015 interview that he had acquired, as both Brown and Wengert indicated that the white Samsung phone that had been used by MV1 had been retrieved from Brown's vehicle, not his person, on October 14, 2015. (Docket ## 118-1 at 18-19; 127 at ¶ 3; Brown's Statement). According to Wengert's affidavit, he placed the phone retrieved on October 22nd into airplane mode, powered it down, and provided it to the property clerk as evidence. (Wengert Aff.). He subsequently sought and obtained a warrant authorizing the search of that phone, which was issued on October 27, 2015. (Wengert Aff.; Docket # 118-1 at 16). That phone was thereafter submitted for forensic review. (Docket # 118-1 at 16).

[9]  On April 15, 2020, the government submitted three compact discs containing footage from body cameras worn by several RPD officers during the execution of the arrest warrant. (Docket # 150). The footage from the body camera worn by Eric J. Alexander (hereinafter "Disc 1") appears to capture the events from the moment of the team's entry into the apartment until the time Brown was escorted from the apartment in handcuffs. Brian Sexstone's camera footage (hereinafter "Disc 3") begins with the entry and captures the events in the apartment until Sexstone exits the apartment approximately seven minutes before Brown was escorted out.

responded that his girlfriend was also in the apartment and requested the opportunity to finish using the restroom. (Disc 1 at 11:13:20; Disc 3 at 11:13:20).

As he was being handcuffed, Brown asked why law enforcement was there. (Disc 1 at 11:13:32; Disc 3 at 11:13:32). One of the officers responded that Brown would be informed shortly and that he would be permitted to finish using the restroom momentarily. (Disc 1 at 11:13:37). Brown again asked the purpose of the police presence, and was told again that everything would be explained shortly. (Disc 1 at 11:13:54; Disc 3 at 11:13:54). At that point, Erny introduced himself to Brown and explained that they had a warrant for his arrest. (Disc 1 at 11:14:08). Brown asked what the warrant was for, and Erny responded, "We're going to talk about it." (Disc 1 at 11:14:19).

Brown reiterated his request to finish using the restroom and was advised he would be allowed to do so soon. (Disc 1 at 11:14:25). Brown was asked, "Any weapons in here sir?" and Brown answered that there were not. (Disc 1 at 11:14:27; Disc 3 at 11:14:27). Brown's girlfriend was escorted from one of the rooms in the rear of the apartment into the living room, where she was instructed to sit on the couch. (Disc 1 at 11:14:34; Disc 3 at 11:14:34). An officer informed Brown that they would retrieve his clothes and asked where they could be located. (Disc 1 at 11:14:39; Disc 3 at 11:14:39).

While the officers were retrieving his clothing, Brown asked why a search warrant was being executed at his house. (Disc 1 at 11:15:02; Disc 3 at 11:15:02). Brown was informed that the officers were executing an arrest warrant that had been issued by a judge and that the basis of the warrant would be explained by the investigators. (Disc 1 at 11:15:22; Disc 3 at 11:15:22). For the next few moments, Brown and the officers discussed Brown's living arrangements and which clothes and shoes he wanted to wear. (Disc 1 at 11:15:25 - 11:16:44;

Disc 3 at 11:15:25 – 11:16:44). Brown was informed that the arrest warrant was for a federal crime and was again asked whether there were any weapons in the premises. (Disc 1 at 11:16:56 – 11:17:17; Disc 3 at 11:16:56 – 11:17:19). Brown denied that there were any weapons. (Disc 1 at 11:17:22; Disc 3 at 11:17:22). He was asked why he possessed a gun holster if he did not possess a gun. (Disc 1 at 11:17:26; Disc 3 at 11:17:26). Brown responded that he did not have a gun in the premises and that there was no gun for the holster. (Disc 1 at 11:17:36; Disc 3 at 11:17:36). He was also asked about a gun on his Facebook page, and Brown responded that he no longer had a Facebook account. (Disc 1 at 11:17:43; Disc 3 at 11:17:43).

At approximately 11:18 a.m., as officers continued to look for clothing for Brown, RPD Officer Sexstone discovered what appeared to be crack cocaine in plain view on the top of a dresser. (Disc 1 at 11:18:00; Disc 3 at 11:18:00). The officers discussed where they would take Brown and whether they should apply for a warrant based upon the suspected narcotics. (Disc 1 at 11:18:00 – 11:18:20; Disc 3 at 11:18:00 – 11:18:20).

One of the officers explained to Brown that they were going to remove the handcuffs to permit him to get dressed and asked that he continue to be a "gentleman" throughout the process. (Disc 1 at 11:20:33). Brown stated that he wanted to know what the arrest warrant was for and was told that they would "get to that." (Disc 1 at 11:21:06). Shortly thereafter, Brown was permitted to dress and to complete using the restroom. (Disc 1 at 1:22:22). Brown can be overheard conversing in the restroom, although the exact dialogue is difficult to decipher. Brown was handcuffed again after leaving the bathroom, and officers assisted him in putting on his shoes. (Disc 1 at 11:24:15 – 11:25:50). Brown was then escorted from the apartment. (Disc 1 at 11:26:28).

III.    **Brown's Affidavit**

Brown submitted an affidavit in support of his suppression motions.[10]  (Docket

# 127).  According to Brown, on October 14, 2015, he was pulled over by law enforcement due

to an alleged traffic violation.  (*Id.* at ¶ 3).  Brown maintains that the investigator subsequently

searched his home and vehicle.  (*Id.*).  Brown states that he "felt compelled" to comply with the

investigator's requests and did not voluntarily consent to those searches.  (*Id.*).  He also

maintains that he "felt compelled" to discuss with law enforcement the events associated with

this case and that any statements he made were not made voluntarily.  (*Id.*).

Brown asserts that while he was going to the bathroom on the morning of April

18, 2018, he heard loud knocks on the door to the apartment he shared with his mother and

girlfriend.  (*Id.* at ¶ 4).  Without dressing, Brown answered the door "in order to explain that [he]

needed time to dress" and finish going to the bathroom.  (*Id.* at ¶ 5).  At that time, Brown

observed several officers with their guns drawn and pointed towards his door.  (*Id.*).  According

to Brown, the "door was unlocked and the officers entered" the apartment.  (*Id.*).  Brown

requested the opportunity to finish going to the bathroom, and one of the officers responded that

he would get Brown some clothes to wear.  (*Id.* at ¶ 6).  Some of the officers entered Brown's

bedroom, and one of the "investigators" told Brown that he was facing a long period of time in

prison and that he "needed to cooperate with their investigation."[11]  (*Id.* at ¶¶ 7-8).  Brown was

also asked, "Where is the gun?"  (*Id.*).  Brown was handcuffed and brought to an interrogation

room at the police station for questioning.  (*Id.* at ¶ 9).  According to Brown, the large number of

---

[10]  Brown also submitted an affidavit dated May 14, 2019, in connection with his original submission.
(Docket # 65 at 28-29).  The assertions made in the May 2019 affidavit are included in the affidavit submitted in
connection with his current submission.  (*Compare* Docket # 65 at 28-29 *with* Docket # 127).

[11]  According to the government, counsel for Brown has represented that this statement was made while
Brown was in the living room of his apartment.  (Docket # 150).

officers present at the apartment, coupled with the "threatening and hostile tone of the investigator," caused him to be fearful of what would happen if he did not cooperate and "impacted the voluntariness" of his alleged statements.  (*Id.* at ¶ 11).

## REPORT AND RECOMMENDATION

### I.    Lawfulness of the October 2015 Search

Brown contends that Wengert engaged in a warrantless search on October 14, 2015, that tainted the subsequent investigation and warrants dismissal of the indictment and suppression of the evidence seized and statements made on April 18, 2018.[12]  (Docket ## 126, 138).  According to Brown, despite investigative reports to the contrary (Docket # 118-1 at 18-19), neither his consent nor the statements he provided on October 14, 2015, were voluntary.  (Docket # 127 at ¶ 3).  Brown's contention is supported solely by his conclusory statement in his affidavit that he felt "compelled" to comply with Wengert's requests and to discuss the facts of this case with him.  (*Id.*).

Although the government has the burden of proving by a preponderance of the evidence that a consent to search was voluntary, the inquiry is an objective one – "whether 'the officer had a reasonable basis for believing that there had been consent to the search.'"  *United States v. Isiofia*, 370 F.3d 226, 230-31 (2d Cir. 2004) (quoting *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995); *United States v. Eggers*, 21 F. Supp. 2d 261, 268 (S.D.N.Y. 1998) ("[i]n this circuit, the test is an objective one – whether the agents had a reasonable basis for believing that there was a valid consent to the search").  Ultimately, the issue of voluntariness is to be

---

[12]  Because Wengert is deceased, and thus unavailable to testify at trial, the government has represented that it will not seek to introduce the evidence seized and statements made in October 2015.  (Docket # 131 at 2). Accordingly, that portion of Brown's motion that seeks to suppress statements made or any evidence seized in October 2015 should be denied as moot.

determined based upon the totality of the circumstances.  *Schneckloth v. Bustamonte*, 412 U.S.

218, 227 (1973); *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir.1993); *United States v.*

*Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990).

> In this case, the government has provided and this Court has reviewed a statement

signed by Brown at the conclusion of the interview on October 14, 2015, affirming that he

consented to Wengert's search of his residence for the phone that MV1 had used, as well as to

the review of his email and Facebook accounts.  (Brown's Statement).  Additionally, the

government has provided a consent form signed by Brown on October 14, 2015, authorizing a

search of Brown's residence and the phone which was used by MV1.  (Consent to Search).  That

form states that the consent was provided "voluntarily, and without fear, threats, or promises of

any kind."  (*Id.*).  Finally, an HSI report authored by Erny indicates that Wengert reported that

Brown provided a signed statement at the conclusion of the interview conducted on October 14,

2015, and that Brown consented to permit Wengert to view his email and Facebook accounts and

to conduct a search of his home and vehicle.  (Docket # 118-1 at 18-19).

> Brown maintains that he "felt compelled to comply with [Wengert's] requests";

significantly, he does not deny that he told Wengert that he could search his residence, vehicle,

and the phone.  (Docket # 127 at ¶ 3).  While evidentiary hearings are often helpful, even if not

always strictly required, where the voluntariness of consent is at issue, a hearing here would not

be probative because Wengert is deceased and unavailable to testify.  His unavailability

notwithstanding, there is documentary evidence of Brown's voluntary consent, including

Brown's contemporaneous signed statement and consent form.  On this record, I find that

Brown's one subjective assertion that he felt "compelled" to provide consent – itself devoid of

any specific facts from which to reach an objective conclusion as to what a reasonable officer

would have believed – is insufficient to dispute the evidence of the voluntariness of his consent or to create an issue of fact requiring a hearing.  *See United States v. Sharma*, 2019 WL 3802223, *8 (S.D.N.Y. 2019) ("[d]efendant relies on conclusory statements that 'an evidentiary hearing will demonstrate that the agents never asked for consent' and that [d]efendant never consented to the agents' search, but [d]efendant has failed to provide any supporting witness affidavits or declarations to dispute any of the [g]overnment's factual assertions set forth in the FBI reports and warrant affidavit"); *United States v. Johnson*, 2017 WL 5891834, *3 (W.D.N.Y.) (defendant failed to submit an affidavit describing "in any way how or why the 'environment' that the defendant was subjected to was in any way 'coercive and intimidating'"), *report and recommendation adopted by*, 2017 WL 5749606 (W.D.N.Y. 2017); *United States v. Walia*, 2014 WL 3563426, *3 (E.D.N.Y. 2014) ("[c]ounsel's allegation that [d]efendant did not recall giving consent to search his [personal property] did not 'contradict the government's claim that [d]efendant did consent to the search of [that personal property]'"); *United States v. Miles*, 2012 WL 4178274, *6 (S.D.N.Y. 2012) ("[a]n evidentiary hearing is required only where 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question'[;] . . . [d]efendant's affidavit does not meet this standard because failing to recall certain conversations with law enforcement does not give rise to a factual dispute, particularly where the [g]overnment supplies undisputed written confirmation of [d]efendant's consent"), *aff'd*, 748 F.3d 485 (2d Cir.), *cert. denied*, 574 U.S. 936 (2014); *United States v. Carter*, 2012 WL 4721117, *2 (W.D.N.Y.) ("the primary issue is the complete lack of factual allegations to support the arguments raised concerning defendant['s] alleged consent to search[;] . . . based on the absence of any factual allegations in the record before the [c]ourt sufficient to require an evidentiary

hearing, this [c]ourt recommends that the defendant's motion to suppress . . . be denied"), *report and recommendation adopted by*, 2012 WL 4713900 (W.D.N.Y. 2012).  In sum, the record before the Court does not establish that the October 2015 consent search was unlawful.[13]  Accordingly, I do not recommend that the district court either dismiss the indictment or suppress the evidence seized and statements made in April 2018 as tainted fruit of the October 2015 search.[14]

---

[13]  To the extent the district court disagrees, neither dismissal of the indictment nor suppression of the April 2018 evidence and statements would necessarily follow.  *See United States v. Watson*, 950 F.2d 505, 507 (8th Cir. 1991) ("the mere fact that information gained during an illegal search gives rise to a subsequent, separate investigation of an individual does not necessarily taint the later investigation") (citing *United States v. Falley*, 489 F.2d 33, 40 (2d Cir. 1973)).  Rather, the proper inquiry would be whether the subsequent investigation (including any subsequently acquired evidence and statements) was sufficiently attenuated from or independent of the unlawful search so as to remove any taint.  *See United States v. Falley*, 489 F.2d at 41 ("[i]f the investigation was in fact instigated by information that was discovered independently of the illegal intrusion and if the illegally obtained information would not have been, in and of itself, sufficient in the normal case to trigger this type of investigation, then the investigation has not been tainted and no indirect, derivative taint attaches to any of the evidence produced by the investigation[;] . . . [and] [i]f the evidence produced by the investigation was simply the normal output of that investigation, then the investigative findings have not been tainted directly"); *United States v. Mosley*, 454 F.3d 249, 254 (3d Cir. 2006) ("a single Fourth Amendment violation does not taint an entire case, but only the evidence uncovered as a result of that violation"); *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir.) ("not all evidence conceivably derived from an illegal search need be suppressed if it is somehow attenuated enough from the violation to dissipate the taint"), *cert. denied*, 537 U.S. 1094 (2002); *United States v. Lin Lyn Trading, Ltd.*, 149 F.3d 1112, 1118 (10th Cir. 1998) ("there is nothing to forbid the government from beginning a new investigation, using the evidence legitimately acquired . . . , and conducted by personnel – both investigatory and prosecutorial – untouched by the taint[;] . . . [i]f the government is able to prosecute its case by presenting untainted evidence derived from legally acquired materials, then it should be allowed to do so; defendants have no right to be protected from governmental actions taken in compliance with constitutional requirements").

[14]  In a letter dated April 13, 2020, counsel for Brown contends that a recent decision by United States Magistrate Judge H. Kenneth Schroeder, Jr., in *United States v. Guay*, 19-CR-103, supports his motion to suppress the evidence seized by Wengert and any evidence "derived therefrom."  This Court disagrees that it provides any specific support for suppression beyond acknowledging the applicability of the exclusionary rule to evidence obtained directly or indirectly as a result of an unlawful search.

## II.    Dismissal of Indictment Due to Pre-charge Delay[15]

Brown contends that dismissal of the indictment is warranted under Rule 48 of the Federal Rules of Criminal Procedure on the grounds that the delay in the filing of charges against him has been so prejudicial to his defense as to violate due process.  (Docket # 118 at 29-30). Specifically, Brown maintains that the government improperly delayed initiating charges during the approximately thirty-month period between the October 2015 traffic stop and his arrest on federal charges in April 2018.  (*Id.*).  Brown has averred that the delay prevented him from confronting Wengert, who led the investigation in 2015 and died two years later.  (*Id.*). Additionally, Brown maintains that "witnesses and potential witnesses have moved or otherwise had changes which prejudice[] [his ability] to call or use potential witnesses . . . helpful to [his] defense."  (*Id.*).

As an initial matter, I agree with the government that Rule 48 is inapplicable because Brown was not arrested or held on federal charges during the period of the contested delay.[16]  *See United States v. Stewart*, 2019 WL 6173775, *9 (D. Vt. 2019) ("[Rule 48] clearly is limited to post-arrest situations").  With respect to any alleged due process violation, "the applicable statute of limitations is the primary guarantee against bringing overly stale criminal charges."  *United States v. Marion*, 404 U.S. 307, 322 (1971) (ellipses omitted).  Statutes of limitations are "designed to protect individuals from having to defend themselves against charges

---

[15]  Although Brown states that he seeks dismissal due to the delay in presentment to the grand jury and "in filing the indictment," his submission makes clear that he is in fact challenging the delay between the inception of the investigation sometime in October 2015 and his arrest on a federal complaint on April 18, 2018.  (Docket # 118 at 29-30 ("[t]he delay of approximately 30 months from the time the investigation began until the time of [Brown's] arrest in this federal matter was unreasonable and unnecessarily prejudicial")).

[16]  Brown has been detained since his arrest on April 18, 2018.  However, his motion does not challenge any alleged prosecutorial delay subsequent to his arrest.

when the basic facts may have become obscured by the passage of time." *Id*. at 323 (internal quotation omitted).

Under certain limited circumstances, however, a pre-indictment delay may amount to a due process violation. *Id*. at 324-25; *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir.), *cert. denied*, 444 U.S. 994 (1979). To sustain such a claim, a defendant carries a "heavy burden" of showing both that the pre-indictment delay "actually prejudiced his ability to defend himself at trial," *United States v. Elsbery*, 602 F.2d at 1059, and offended "concepts of fair play and decency, such as would occur if the prosecutor deliberately used the delay to achieve a substantial tactical advantage," *United States v. Rubin*, 609 F.2d 51, 66 (2d Cir. 1979), *aff'd on other grounds*, 449 U.S. 424 (1981). The proof of the prejudice must be "definite and not speculative," and the defendant must demonstrate specifically how the loss of evidence is prejudicial. *United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982). A witness's loss of memory generally does not establish the requisite prejudice. *Elsbery*, 602 F.2d at 1059.

Here, Brown relies on Wengert's death, as well as his conclusory assertion that other, unspecified witnesses are either unavailable or have faded memories. He has not demonstrated, however, how any testimony from Wengert would aid in his defense or, stated another way, how its loss is prejudicial. *United States v. Stewart*, 2019 WL 6173775, at *10 ("[b]ecause [d]efendant concedes that he cannot ascertain whether the two witnesses who died would present favorable testimony, the assertion that a missing witness might have been useful does not show the 'actual prejudice'") (internal quotations and brackets omitted). That failure is particularly striking because the government has represented that it will not seek to introduce any evidence gathered by Wengert. With respect to other witnesses, Brown's conclusory and

15

speculative allegations are insufficient to demonstrate prejudice. *See United States v. Marion*, 404 U.S. at 326 ("[i]n light of the applicable statute of limitations, . . . the[] possibilities [that memories will dim, witnesses become inaccessible, and evidence be lost] are not in themselves enough to demonstrate that [defendant] cannot receive a fair trial and to therefore justify the dismissal of the indictment"); *United States v. Drago*, 2019 WL 4364644, *3 (E.D.N.Y.) ("[f]aded recollections and missing peripheral witnesses are not enough") (quoting *United States v. Rubin*, 609 F.2d at 66), *report and recommendation adopted by*, 2019 WL 3072288 (E.D.N.Y. 2019).

Further, Brown has neither alleged nor shown that the government delayed the charge to obtain a tactical advantage. On this record, I find that Brown has failed to establish that any pre-indictment delay violated his due process rights. *United States v. Burke*, 2011 WL 2609837, *7 (E.D.N.Y. 2011) (denying motion to dismiss indictment based on thirty-year pre-indictment delay because, even if unavailability of alibi witnesses were prejudicial, defendant failed to show that government delayed for its own benefit), *aff'd*, 552 F. App'x 60 (2d Cir. 2014). Accordingly, I recommend that Brown's motion to dismiss the indictment be denied.

### III.    <u>Suppression of April 18, 2018 Statements</u>

I turn finally to Brown's motion to suppress the statements he made during the April 18, 2018 interview at the Public Safety Building on the grounds that they were not voluntarily made.[17] (Docket ## 118 at 6-7; 126 at ¶¶ 2-4; 127 at ¶¶ 4-11). On the record before

---

[17]  During oral argument on February 22, 2016, the government represented that it would only seek to introduce statements made by Brown at the Safety Building after he was advised of his *Miranda* rights. With respect to those statements, as confirmed by his counsel during that appearance, Brown does not maintain that they

me, including Brown's affidavit addressing the circumstances of his arrest and the video recordings of the encounter, I conclude that the government has established that the statements Brown made at the Public Safety Building on April 18, 2018 were voluntarily made.

It is the government's burden to establish that a defendant's statements were made voluntarily within the meaning of the Due Process Clause. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000) (recognizing that there are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment"). In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

---

were taken in violation of his *Miranda* rights; rather, he challenges them solely on the basis that they were involuntary.

The video footage provided by the government demonstrates that after the initial entry and sweep of the residence, members of the arrest team talked calmly with Brown, explained their presence, and permitted him to dress and finish using the restroom before transporting him to the Public Safety Building. The entire encounter inside the apartment lasted approximately twenty minutes, during which time – apart from his repeated requests to finish using the restroom – Brown did not complain about pain or discomfort, did not appear to be distressed or overly emotional, and conversed calmly and coherently with the officers. The totality of the circumstances demonstrates that Brown's statements were voluntary.

Brown disputes that his statement was voluntary, maintaining that the circumstances of law enforcement's entry into his residence, coupled with a threat by an investigator concerning the possible length of Brown's sentence if convicted, and the "threatening and hostile tone" of that investigator, rendered his statements involuntary. This challenge, even if credible, is unavailing.[18]

As an initial matter, although several armed officers entered Brown's apartment, the video recordings demonstrate that the officers' conduct was generally restrained and courteous. Even if the circumstances of the officers' entry into the apartment that day could be considered intimidating, without more, those circumstances would not render Brown's subsequent statements involuntary. *See United States v. Laidlaw*, 2010 WL 382551, *6 (D. Conn. 2010) ("[a]lthough being arrested by officers who have their weapons drawn is intimidating, 'the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness'") (quoting *United States v. Snype*, 441 F.3d 119, 131 (2d Cir.), *cert. denied*, 549 U.S. 923 (2006)).

---

[18] Because I conclude that Brown's allegations, even if credited, are insufficient to demonstrate that his statement was involuntary, an evidentiary hearing concerning the voluntariness of his statements is not warranted.

Likewise, even crediting Brown's statement that a member of the arresting team used a hostile or threatening tone[19] and/or told him that he should cooperate because he faced a significant prison term – assertions that appear refuted by the video evidence proffered by the government[20] – those facts are insufficient to demonstrate that his will was overborne.  *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive"), *cert. denied*, 516 U.S. 1182 (1996); *United States v. Bye*, 919 F.2d 6, 9-10 (2d Cir. 1990) ("we are unconvinced that the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation converts an otherwise proper encounter between the police and the accused into a coercive and overbearing experience").

In sum, having reviewed the footage of Brown's arrest, I find that the circumstances of his arrest were not sufficient to overbear his will and render his statements involuntary.  Accordingly, I recommend that the district court deny Brown's motion to suppress statements.

---

[19]  The reasonable interpretation of Brown's affidavit is that the hostile tone was used by the investigator who allegedly threatened him with lengthy incarceration while they were in his apartment.  However, even if Brown's affidavit could be interpreted to suggest that the investigator who questioned him at the Public Safety Building after his arrest used a hostile tone, such an allegation without more would similarly be insufficient to suggest or establish that his will was overborne.  *See United States v. Mitchell*, 2013 WL 5300687, *6 (N.D. Tex. 2013) ("an officer raising his voice does not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne[;] . . . "[t]he court certainly does not expect an interrogator to act in a coercive, threatening, or overbearing manner; however, an interrogation is not a playbook for civility") (internal quotations omitted).

[20]  As noted *infra*, the body camera footage depicts the circumstances of Brown's arrest from the moment the arrest team entered the apartment building until the time that Brown was escorted from his apartment approximately twenty minutes later.  The Court has reviewed the footage; it does not depict anyone advising Brown to cooperate or informing him that he faced a significant prison sentence.  To the contrary, members of the arrest team repeatedly declined to discuss the nature of the charges against Brown, despite his repeated requests, and instead told him that everything would be explained to him at a later time.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that the district court deny Brown's motions to dismiss the indictment and to suppress evidence seized and statements made on April 18, 2018. **(Docket ## 65, 118, 126, 127, 138)**. Further, I recommend that the district court deny as moot Brown's motion to suppress evidence seized or statements made on October 14, 2015. **(Docket ## 65, 118)**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      May 22, 2020

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[21]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
          May 22, 2020

---

[21]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).